UNITED STATES of America ex rel. Harold R. FINE, Plaintiff–Appellant,

v.

SANDIA CORPORATION, a foreign corporation, Defendant–Appellee,

United States of America, Amicus Curiae.

No. 94–2121.

United States Court of Appeals, Tenth Circuit.

Nov. 21, 1995.

Maureen A. Sanders, Albuquerque, New Mexico (Duff H. Westbrook of Duff H. Westbrook, P.C., Albuquerque, New Mexico, with her on the briefs), for Plaintiff–Appellant.

John A. Bannerman of Beall, Biehler & Bannerman, Albuquerque, New Mexico, and William D. Hunter of Pettit & Martin, San Francisco, California (T. Scott Hyde of Beall, Biehler & Bannerman, Albuquerque, New Mexico; Lawrence S. Greher of Sandia Corporation, Albuquerque, New Mexico, with him on the brief), for Defendant–Appellee.

Dara A. Corrigan (Michael F. Hertz and Joan E. Hartman, on the brief), Attorneys, Civil Division, U.S. Department of Justice, Washington, D.C., for Amicus Curiae.

Before SEYMOUR, Chief Judge, MOORE and EBEL, Circuit Judges.

SEYMOUR, Chief Judge.

Harold R. Fine filed this *qui tam* action against Sandia Corporation (Sandia), which operates Sandia National Laboratory under a contract with the United States Department of Energy (DOE). Mr. Fine alleges that Sandia misappropriated nuclear waste funds in violation of the Nuclear Waste Policy Act (NWPA). The district court dismissed the action for lack of subject matter jurisdiction. Because we conclude that this action is based in part upon publicly disclosed allegations and transactions and because Mr. Fine was not an original source of that information, we affirm.

I.

Sandia National Laboratory is one of nine multiprogram laboratories owned by the United States government and operated by private or university contractors under the DOE's administrative oversight. In December 1990, the United States General Accounting Office (GAO) issued a report examining the discretionary research and development (R & D) activities at three of the laboratories, including the Sandia laboratory (GAO report). The report included a section which focused on the "taxing"[1] of nuclear waste funds by two of the laboratories during fiscal years 1988 and 1989. *See* U.S. General Accounting Office, RCED–91–18, Energy Management Better DOE Controls Needed Over Contractors' Discretionary R & D Funds 40–41 (December 1990). Concluding that those funds should be used only for research involving the storage and disposal of radioactive waste, the report noted that the Los Alamos and Lawrence Livermore Laboratories had assessed $1 million and $420,000 respectively from the waste fund for their discretionary R & D projects in 1989. *Id.* The report suggested that it was not the first to discover the practice:

Officials from DOE's Office of Civilian Radioactive Waste Management are aware of the laboratories' practice of assessing monies spent at the laboratories for their discretionary R & D activities. An official in [that office] told us that the Office recognizes that assessing monies from the waste fund for discretionary R & D may be a violation of the [NWPA] and referred the issue to the DOE [Inspector General (IG) ] about 2 years ago. According to this official, the IG in turn referred the issue to the DOE General Counsel, who has not yet determined whether the practice is permissible.

*Id.* at 41. Thus, the report indicates that the DOE knew some of its laboratories were "taxing" nuclear waste funds for use in discretionary research and did not condemn the practice.

A congressional hearing in March 1991 further probed the laboratories' practice. The Environment, Energy and Natural Resources Subcommittee on Government Operations held a hearing to examine the DOE's practice of "allowing the contractors that operate its major multiprogram laboratories to withhold funds from authorized research programs and research contracts, and to use such funds for other laboratory activities at the discretion of the contractor." Review of the Department of Energy's Discretionary Laboratory Research Funds: Hearing Before the Environment, Energy, and Natural Resources Subcomm. of the House Comm. On Government Operations, 102d Cong., 1st Sess. 1 (1991) (opening statement of Rep. Mike Synar). In his testimony before the subcommittee, Victor S. Rezendes, the GAO Director of Energy Issues, listed two instances where the "taxing" of certain funds violated appropriations restrictions. *Id.* at 129. He testified that

[o]ne was the Nuclear Waste Policy Act. Basically, that prohibits any tapping into that fund for other than the objectives of establishing a nuclear waste disposal repository and related activities.

---

**1.** To provide funding for discretionary R & D projects, the laboratories "tax," or make assessments against, their total appropriations. For example, a laboratory imposing a two percent tax will earmark two percent of its total funding for use in R & D, regardless of the source or purpose of the funding.

And what we found is that that was being charged the same overhead rates as, basically, any other DOE program. And in 1989, for example, that amounted to roughly about $1.5 million.

*Id.* Although the hearings did not specify specifically that Sandia was "taxing" nuclear waste funds, they did shed further light on the national laboratories' practice.

At the time of the GAO report and the congressional hearing, Mr. Fine was employed by the DOE's Office of Inspector General, where his duties included auditing Sandia. Following his retirement in July 1991, he continued to investigate the activities of Sandia and other government contractors. He claims that these post-retirement investigations, including his receipt of an anonymous phone call and his independent confirmation of it, formed the basis of the present complaint.

On April 6, 1992, Mr. Fine filed this *qui tam* action alleging that Sandia improperly assessed a 2.5% "tax" against nuclear waste funds during fiscal years 1991 and 1992 and used the diverted funds in generic, discretionary R & D activities. Because the NWPA specifically earmarks the funds for research on the storage and disposal of radioactive waste, he asserts that Sandia knowingly presented a false claim to the government when it certified that it had spent the funds in accordance with the applicable rules and regulations.

Mr. Fine filed this action pursuant to 31 U.S.C. § 3730, the *qui tam* provision of the False Claims Act (FCA). This statute authorizes private individuals, acting on behalf of the government, to bring civil actions against those who defraud the government. To encourage the exposure of fraudulent activities, the FCA allows a successful *qui tam* plaintiff to receive up to 30% of the final recovery.

However, to ensure that individuals cannot use the *qui tam* provisions to benefit from frauds already exposed through other means, the FCA contains explicit jurisdictional requirements. The statute bars suits which are

based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or [GAO] report, hearing, audit, or investigation, or from the news media, unless ... the person bringing the action is an original source of the information.

*Id.* § 3730(e)(4)(A). The FCA defines "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing [a *qui tam* action] which is based on the information." *Id.* § 3730(e)(4)(B).

Applying these requirements, the district court concluded that it did not have jurisdiction over Mr. Fine's complaint. The court held that the general allegations regarding the laboratories' "taxing" of nuclear waste funds contained in the 1990 GAO report and the 1991 congressional hearing were sufficient to constitute "public disclosures" of the practice.[2] Although the court held that Mr. Fine's former employment with the DOE Inspector General did not preclude him from filing a *qui tam* action,[3] it determined that he was not an "original source" because "as a government auditor he did not have 'direct and independent knowledge' of the publicly disclosed information." Aplt.App. at 175. The court therefore dismissed the complaint.

## II.

Mr. Fine's sole contention on appeal is that neither the 1990 GAO report nor the 1991

2. Sandia introduced seven documents which it claimed constituted public disclosures. After examining each document, the district court concluded that only the 1990 GAO report and the 1991 congressional hearing met the requirements of § 3730(e)(4)(A). On appeal, Sandia claims that the court should have found two additional public disclosures. Because we hold that the GAO report and congressional hearing were public disclosures sufficient to invoke the jurisdictional bar, we need not address this issue.

3. Sandia initially argued below that Mr. Fine could not be a *qui tam* plaintiff because of a statutory conflict between the Inspector General Act, 5 U.S.C.App. 3, and the False Claims Act. Although Sandia abandoned this argument below, the United States as amicus has reasserted it on this appeal. In light of our conclusion that § 3730(e)(4) bars Mr. Fine's action, we do not address this argument.

congressional hearing constitutes a "public disclosure" for purposes of the jurisdictional bar. *See* Aplt.Br. at 3. We review de novo the district court's conclusion that it did not have subject matter jurisdiction. *United States ex rel. Precision Co. v. Koch Industries*, 971 F.2d 548, 551 (10th Cir.1992).

Although Mr. Fine concedes that the GAO report and the congressional hearing are the *types* of disclosures which invoke the jurisdictional bar, he contends that those disclosures did not contain the allegations or transactions upon which his complaint is based. He argues that those disclosures "merely described the national laboratories' practice of 'taxing' Nuclear Waste Funds for discretionary [R & D] projects," Br. of Aplt. at 11, whereas his complaint alleges that Sandia in particular "taxed" nuclear waste funds in fiscal years 1991 and 1992. Because these disclosures detailed the mechanics of the practice, revealed that at least two of Sandia's eight sister laboratories were engaged in it, and indicated the DOE's acquiescence, we conclude that they sufficiently alerted the government to the likelihood that Sandia would also "tax" nuclear waste funds in the future.

■ The FCA's jurisdictional scheme seeks "the golden mean between adequate incentives for whistle-blowing insiders with genuinely valuable information and discouragement of opportunistic plaintiffs who have no significant information to contribute of their own." *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645, 649 (D.C.Cir.1994). We analyze Mr. Fine's claim in the context of Congress' "twin goals of rejecting suits which the government is capable of pursuing itself, while promoting those which the government is not equipped to bring on its own." *Id.* at 651; *see United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1514 (8th Cir.1994) (*qui tam* suits barred by public disclosures which " 'set government investigators on the trail of fraud' ")

(quoting *Springfield*, 14 F.3d at 655); *United States ex rel. S. Prawer & Co. v. Fleet Bank*, 24 F.3d 320, 326 (1st Cir.1994). Because the GAO report and the congressional hearing set the government squarely on the trail of the alleged fraud without Mr. Fine's assistance, we believe it would be contrary to the purposes of the FCA to exercise jurisdiction over his claim.

The GAO report clearly put the government on notice that some of the DOE laboratories were "taxing" nuclear waste funds in favor of R & D activities. Furthermore, the report implicated the DOE itself, noting that the DOE had been aware of the practice since at least 1989 and had done nothing to discourage it. In fact, the December 1990 report indicated that the DOE had yet to form an official opinion on the permissibility of the practice.

The congressional hearing again aired the laboratories' practice. Without naming the specific laboratories involved, a GAO official testified that DOE laboratories were "taxing" nuclear waste funds. The official gave no indication that the DOE had found the practice impermissible. As of March 1991, therefore, the DOE knew and implicitly approved of the practice, and the GAO and Congress knew that the DOE knew. The GAO and Congress also knew that the DOE controlled only nine laboratories. Given the DOE's acquiescence in the practice and the limited number of laboratories under its control, we can assume that any further investigation into the "taxing" of nuclear waste funds would include Sandia.[4]

Relying upon *Cooper v. Blue Cross & Blue Shield of Florida, Inc.*, 19 F.3d 562 (11th Cir.1994), Mr. Fine claims that public disclosures of improper practices among national laboratories other than Sandia do not preclude his action against Sandia for engaging in those practices. The facts in *Cooper* are easily distinguishable from those in the case

---

4. In fact, the initial investigations into the practice most likely included Sandia. According to Mr. Fine's complaint, Sandia did not begin "taxing" the funds until the fiscal years 1991 and 1992. *See* Aplt.App. at 4–5. The information contained in the GAO report (upon which the congressional testimony was presumably based)

covered fiscal years 1988 and 1989. Only three laboratories were the subject of that report, Sandia and the two laboratories whom the report claimed engaged in the practice. We can thus assume that the GAO investigators scrutinized Sandia's use of its nuclear waste funds.

at hand. In *Cooper*, the plaintiff alleged that the defendant insurer had engaged in fraud under the Medicare Secondary Payer program. The district court dismissed the claim, citing public disclosures which alleged widespread fraud in the insurance industry and identified other insurers who had defrauded the same program. The Eleventh Circuit reversed, holding that disclosures which did not name the defendant were not "public disclosures" under section 3730(e)(4)(A). The court relied upon the fact that "[t]he government often knows on a general level that fraud is taking place and that it, and the taxpayers, are losing money. But it has difficulty identifying all of the individual actors engaged in the fraudulent activity." *Id.* at 566. The instant case presents no such difficulty. When attempting to identify individual actors, little similarity exists between combing through the private insurance industry in search of fraud and examining the operating procedures of nine, easily identifiable, DOE-controlled, and government-owned laboratories. *Cooper* is inapplicable to this case.

Mr. Fine also asserts that his action is not barred because the GAO report and the congressional hearing only determined that "taxing" nuclear waste funds might violate the NWPA and did not allege a corresponding violation of the False Claims Act (FCA), under which he filed his suit. *See* Aplt.Br. at 13–14. He cites no authority for this position, and we find his argument unpersuasive. Section 3730(e)(4)(A) merely requires the public disclosure of "allegations or transactions" upon which the *qui tam* action is based. It does not require that the allegations have the same statutory basis. Furthermore, the public disclosure of the material elements of the fraudulent transaction bars *qui tam* actions even if the disclosure itself does not allege any wrongdoing. *See Springfield*, 14 F.3d at 655. Finally, if we adopt Mr. Fine's position, we would render the jurisdictional bar virtually powerless. The FCA, with its *qui tam* provision, is a means to pursue a remedy for violations of other statutory provisions, here the NWPA. Governmental bodies that make the public disclosures will generally focus on the underlying violation, which they can often redress

without resort to the FCA. We reject the notion that this failure to mention the FCA opens the door to otherwise parasitic *qui tam* actions.

Citing our decision in *United States ex rel. Precision Co. v. Koch Industries*, 971 F.2d 548 (10th Cir.1991), Mr. Fine also claims that his action is not "based upon" the public disclosures because no "substantial identity" exists between them and the allegations contained in his complaint. In *Precision*, however, we construed the "based upon" test broadly, *see id.* at 552–53, and concluded that section 3730(e)(4)(A) bars even those *qui tam* complaints which are based only *in part* upon public disclosures. In concluding that the *Precision* complaint had a partial basis in the public disclosures at issue there, we relied upon the fact that the allegations in the complaint were substantially the same as allegations in the public disclosures. On the basis of our conclusion that the public disclosures here were sufficient to put the government on notice as to Sandia's potential for misappropriating nuclear waste funds, we hold that substantial identity exists between allegations in the GAO report and congressional hearing and allegations contained in Mr. Fine's complaint.

Even where a *qui tam* action is based upon a public disclosure, section 3730(e)(4) does not bar the action if the *qui tam* plaintiff is an "original source" of the information contained in the public disclosure. Mr. Fine concedes, however, that he is not an original source of the information in the 1990 GAO report or the 1991 congressional hearing. *See* Aplt.Br. at 3 n. 1; Aplt.Reply Br. at 11. Therefore, we need not engage in an "original source" analysis.

## III.

Congress instituted the *qui tam* provisions of the FCA to encourage private citizens to expose fraud that the government itself cannot easily uncover. That purpose is not served by allowing *qui tam* plaintiffs to recover where, as here, the government has already identified the problem and has an easily identifiable group of probable offenders. Because we conclude that the GAO

report and the congressional hearing constitute "public disclosures" for purposes of the jurisdictional bar, we AFFIRM the district court's dismissal of Mr. Fine's complaint.