UNITED STATES of America ex rel.
Russell E. DINGLE and Thomas
L. Rempfer, Plaintiffs,

v.

BIOPORT CORPORATION and
Robert Myers, Defendants.

No. 5:00–CV–124.

United States District Court,
W.D. Michigan,
Southern Division.

June 18, 2003.

Russell E. Dingle, East Hartford, CT, pro se.

Kenneth T. Levine, Nelson Levine Deluca, Blue Bell, PA, Thomas L. Rempfer, West Suffield, CT, Ronald M. Stella, Robert I. Dodge, Grand Rapids, MI, and Mike Davidson, Washington, DC, for Plaintiffs.

J. Terrance Dillon, Myers, Nelson, Dillon & Shierk, PLLC, Grand Rapids, MI, Breckinridge L. Willcox, Ronald H. Clark, D. Jacques Smith, Brian C. Lansing, Arent Fox Kintner Plotkin & Kahn, PLLC, Washington, DC, for Defendants.

## *OPINION*

QUIST, District Judge.

Plaintiffs/would-be-relators', Russell E. Dingle ("Dingle") and Thomas L. Rempfer ("Rempfer") (collectively "Plaintiffs"), Amended Complaint is a *qui tam* action filed pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733. Before the Court is Defendants', BioPort Corporation ("BioPort") and Robert Myers ("Myers") (collectively "Defendants"), Motion to Dismiss the Amended Complaint with Prejudice. Defendants assert, *inter alia,* that Plaintiffs are jurisdictionally barred from bringing suit under the FCA pursuant to 31 U.S.C. § 3730(e)(4), because Plaintiffs' suit is based upon information publicly disclosed prior to the filing of Plaintiffs' suit, of which Plaintiffs were not the original source. The Court will grant Defendants' motion and dismiss Plaintiffs' Amended Complaint with prejudice.

### *Factual and Procedural History*

Plaintiffs are members of the United States Air Force Reserve. Formerly, both were members of the Air National Guard for Connecticut, and in that capacity they became familiar with the Government's anthrax vaccine program. Specifically, both Dingle and Rempfer were members of a military research team investigating the anthrax vaccine and its safety for human use.

Defendants in this matter are BioPort and Myers, who is the Chief Executive Officer of BioPort. BioPort came into existence as a corporation in May 1998, and Plaintiffs acknowledge in their Amended Complaint that BioPort acquired the Government contracts for anthrax vaccine in September 1998, from the Michigan Biologic Products Institute ("MBPI"). The parties agree that the MBPI was formerly known as the Biologic Products Division ("BPD"), and that at some point in the past the BPD was a division within the State of Michigan's Department of Public Health. Myers was involved with the MBPI as well.

On October 10, 2000, Plaintiffs filed this *qui tam* action to recover damages and civil penalties on behalf of the United States arising from allegedly false statements and claims made by Defendants in violation of the FCA. Pursuant to the FCA, the Complaint was placed under seal to allow the Government time to make a decision about whether it would actively prosecute the case. On September 21, 2001, the Government filed its Notice of Election to Decline Intervention. On September 25, 2001, the case was ordered unsealed so that it could proceed.

Defendants filed their motion to dismiss Plaintiffs' Complaint on April 4, 2002. On August 29, 2002, the Court denied Defendants' motion to dismiss Plaintiffs' Complaint, but ordered Plaintiffs to submit an amended complaint to comply with Rule 9(b) of the Federal Rules of Civil Procedure. Plaintiffs filed their Amended Complaint on September 18, 2002. Plaintiffs'

Amended Complaint alleges that Defendants knowingly concealed material facts from the Government regarding BioPort's production of the anthrax vaccine, thus causing the Government to suffer millions of dollars in damages as a result of Defendants' past and ongoing fraud. Specifically, Plaintiffs allege that between July 26, 1990, and approximately April 1992, MBPI added four fermentors to its vaccine production line. (Pls.'/Relators' Supp. Mem. Law Regarding Public Disclosure Bar Arguments at 3.) Plaintiffs claim that these four new fermentors contained different components than the fermentors that MBPI used to produce the licensed vaccine, and that these different components were inferior to the components used in the original, licensed production line. Plaintiffs focus on two allegedly different components used in the new fermentors: (1) the new fermentors were stainless steel lined rather than glass lined; and (2) the new fermentors used "low-protein-binding nylon membrane filters" instead of "stintered glass filters." (*Id.* at 3–4.) The result of these changes, Plaintiffs argue, was that all vaccine produced and sold to the Government "after the July 1990 manufacturing changes and change of filters and until at least April 2001 had not been properly approved by the FDA prior to production and/or sale." (*Id.* at 4, 8.) Plaintiffs thus contend that Defendants misrepresented: (1) BioPort's compliance with Public Health Service regulations; (2) BioPort's compliance with the Federal Food, Drug, and Cosmetic Act; (3) BioPort's ability to comply with its representations to the Government, including the first provision of the DAMD17–98–C–8052 contract, because BioPort did not have adequate production capacities; and (4) the general properties of BioPort's anthrax vaccine for sale to the Government in violation of the General Standards of the Federal Acquisition Regulations.

On September 20, 2002, Defendants filed a motion for reconsideration of the Court's August 29, 2002, Order. Defendants asserted that Plaintiffs' claims should be dismissed with prejudice because: (1) the Novation Agreement between BioPort, MBPI, and the Government neither imposes statutory FCA liability nor waives Eleventh Amendment Immunity; and (2) all claims against Myers arise out of his tenure as director of a state affiliated organization, and suit against him is barred by the Eleventh Amendment. Defendants also filed a motion to dismiss Plaintiffs' Amended Complaint on October 4, 2002. In their second motion to dismiss, Defendants raised three new grounds for dismissal, and reasserted the two grounds to dismiss that they raised in their motion for reconsideration. The Court did not take immediate action on Defendants' motion for reconsideration because it believed that there was a possibility that the case would be dismissed for lack of subject matter jurisdiction. The Court thus twice notified the parties, on March 27, 2003, and May 9, 2003, that it would take judicial notice of some evidence submitted by Defendants that may indicate that Plaintiffs do not qualify as relators.

### Judicial Notice

In its March 27, 2003, and May 9, 2003, Memorandum Orders, the Court stated that in determining whether the Amended Complaint fails to state a claim, the Court may consider, without converting Defendants' motion to dismiss into a motion for summary judgment, the facts alleged in the Amended Complaint, any documents attached or incorporated in the Amended Complaint, and public documents of which the Court can take judicial notice. *Jackson v. City of Columbus,* 194 F.3d 737, 745 (6th Cir.1999), *overruled in part on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508–14, 122

S.Ct. 992, 996–99, 152 L.Ed.2d 1 (2002); *Yeary v. Goodwill Indus.-Knoxville, Inc.,* 107 F.3d 443, 445 (6th Cir.1997); *Armengau v. Cline,* 7 Fed.Appx. 336, 344, 345 (6th Cir.2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6)."). Federal Rule of Evidence 201 governs judicial notice of adjudicative facts. *Toth v. Grand Trunk R.R.,* 306 F.3d 335, 349 (6th Cir. 2002). Rule 201(b) provides:

> (b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Fed.R.Evid. 201(b). Public records and government documents are generally considered "not to be subject to reasonable dispute." *Jackson,* 194 F.3d at 745. This includes public records and government documents available from reliable sources on the Internet. *See, e.g., Grimes v. Navigant Consulting, Inc.,* 185 F.Supp.2d 906, 913 (N.D.Ill.2002) (taking judicial notice of stock prices posted on a website); *Cali v. E. Coast Aviation Servs., Ltd.,* 178 F.Supp.2d 276, 287 (E.D.N.Y.2001) (taking judicial notice of documents from Pennsylvania state agencies and Federal Aviation Administration).

▪ A court must take judicial notice "if requested by a party and supplied with the necessary information." Fed.R.Evid. 201(d). "A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed." Fed.R.Evid. 201(e). However, a party opposing a motion to dismiss is not entitled to cure defects in its complaint without the court's leave to amend. *Begala v. PNC Bank, Ohio, Nat'l Ass'n,* 214 F.3d 776, 784 (6th Cir.2000).

▪ Defendants asked the Court to take judicial notice of eleven sources of information, and the Court elected to take judicial notice of seven of those sources. Six of the sources are congressional documents: *Statements of Captain Thomas L. Rempfer, Connecticut National Guard, and Major Russell E. Dingle, Connecticut Air National Guard: Hearing Before the Subcomm. on Nat'l Sec., Veterans' Affairs, and Int'l Relations, House Comm. on Gov't Reform,* 106th Cong. (March 24, 1999) (statements of Captain Thomas L. Rempfer and Major Russell E. Dingle) (hereinafter "Plaintiffs Testimony on Mar. 24, 1999"); *The Performance of the Anthrax Inoculation Program: Hearing Before the Subcomm. on Nat'l Sec., Veterans' Affairs, and Int'l Relations, House Comm. on Gov't Reform,* 106th Cong. (Mar. 24, 1999) (statement of Mark S. Zaid, Esq.) (hereinafter "Zaid Testimony"); *Medical Readiness: Safety and Efficacy of the Anthrax Vaccine: Hearing Before the Subcomm. on Nat'l Sec., Veterans' Affairs, and Int'l Relations, House Comm. on Gov't Reform,* 106th Cong. (Apr. 29, 1999) (statement of Kwai–Cheung Chan, Director, Special Studies and Evaluations, National Security and International Affairs Division) (hereinafter "Chan Testimony on Apr. 29, 1999"); *Anthrax Vaccine: Safety and Efficacy Issues: Hearing Before House Comm. on Gov't Reform,* 106th Cong. (Oct. 12, 1999) (statement of Kwai–Cheung Chan, Director, Special Studies and Evaluations, National Security and International Affairs Division) (hereinafter "Chan Testimony on Oct. 12, 1999"); The Department of Defense Anthrax Vaccine Immunization Program: Unproven Force Protection, H.R.Rep. No. 106–556 (Apr. 3, 2000) (hereinafter "House Report"); *Anthrax Vaccine: Changes to the Manufacturing Process: Hearing Before the Subcomm. on Nat'l Sec., Veterans' Affairs, and Int'l Relations, House Comm. on*

*Gov't Reform,* 107th Cong. (Oct. 23, 2001) (statement of Nancy Kingsbury, Ph.D., Managing Director, Applied Research and Methods) (hereinafter "Kingsbury Testimony"). The Court found in its March 27, 2003, Memorandum Order that these sources of information are not subject to reasonable dispute; thus, it took judicial notice of them.

Defendants also asked the Court to take judicial notice of information posted on three private websites dedicated to the anthrax vaccine: Anthrax Vaccine Home Page, *available at* http://www.anthraxvaccine.org (last visited Oct. 4, 2002); Anthrax Vaccine Network, Inc., *available at* http://www.anthraxvaccine.net (last visited Oct. 4, 2002); GulfBLINK: Website Debunking the Special Assistant for Gulf War Illnesses, *available at* http://www.gulflink.org/Vaers/inspection.htm (last visited Oct. 4, 2002). In its March 27, 2003, Memorandum Order, the Court found that information contained on these websites is subject to reasonable dispute. Thus, as the Court could not verify the information found on these websites for accuracy or authenticity, the Court did not take judicial notice of those sources.

Defendants also asked the Court to take judicial notice of an August 25, 2000, article from the Lansing State Journal that Defendants filed as "Exhibit D" to their motion to dismiss the Amended Complaint (docket no. 42) on December 30, 2002. (A.J. Evenson, *Documents Hold Anthrax Secrets,* Lansing State Journal, Aug. 25, 2000, at 1A, 7A, Br. Supp. Mot. Dismiss Amend. Compl. Ex. D.) In its May 9, 2003, Memorandum Order, the Court found that this source of information is not subject to reasonable dispute, thus the Court took judicial notice of the newspaper article.

In both its March 27, 2003, and May 9, 2003, Memorandum Orders, the Court provided Plaintiffs with the opportunity to submit, within twenty-one days of the respective Memorandum Orders, any argument and any source of which the Court may take judicial notice and/or which Plaintiffs wish to introduce by affidavit in order to rebut the evidence submitted by Defendants. On May 8, 2003, Plaintiffs responded to the Court's March 27, 2003, Memorandum Order, and asserted that each of the six congressional documents did not specifically address the "core underlying allegations and transactions" that form the basis of Plaintiffs' allegations. (Pls.'/Relators' Supp. Mem. Law Regarding Public Disclosure Bar Arguments at 9–10.) On June 2, 2003, Plaintiffs responded to the Court's May 9, 2003, Memorandum Order, and asserted that the Court should not rely on the Lansing State Journal article as a public disclosure because it contained incorrect information, even though it addressed the filter and container changes that are the bases of Plaintiffs' Amended Complaint.

### *Discussion*

Defendants contend that Plaintiffs are jurisdictionally barred from serving as relators. The FCA contains a *qui tam* provision that permits a private individual to bring a civil action for violation of § 3729 as a "relator" on behalf of the United States. 31 U.S.C. § 3730(b)(1). Under the FCA, the Government may recover treble damages from one who has committed a fraud upon the Government, and the individual who brought the action may receive up to 30% of the money recovered. 31 U.S.C. § 3730(d)(2).

Section 3730(e)(4) restricts the subject matter of the courts in relation to *qui tam* actions brought under the FCA. The FCA contains the following jurisdictional bar to a potential relator:

(4)(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations

or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information

FCA, 31 U.S.C. § 3730(e)(4). "The jurisdictional requirements are designed to restrict the number of persons who can bring qui tam actions and thereby avoid parasitic suits." *United States ex rel. McKenzie v. BellSouth Telecomms., Inc.,* 123 F.3d 935, 940 (6th Cir.1997).

■ In *United States ex rel. Jones v. Horizon Healthcare Corp.,* 160 F.3d 326, 330–31 (6th Cir.1998), the Sixth Circuit expounded a four-part test in determining whether a relator's case is jurisdictionally barred by § 3730(e)(4). The *Jones* court stated:

[I]t is useful to break the inquiry down into its elements: (A) whether there has been a public disclosure in a criminal, civil or administrative hearing; or congressional, administrative, or government report, hearing, audit, or investigation; or from the news media; (B) of the allegations or transactions that form the basis of the relator's complaint; and (C) whether the relator's action is "based upon" the publicly disclosed allegations or transactions. If the answer is "no" to any of these questions, the inquiry ends and the *qui tam* action may proceed. If the answer to each of the above ques-

tions is "yes," then the final inquiry is (D) whether the relator qualifies as an "original source" under § 3730(e)(4)(B), which also would allow the suit to proceed.

*Id.* at 330.

## A. *Whether there has been a "Public Disclosure"*

■ "The first inquiry in determining whether the jurisdictional bar of the FCA applies is whether there has been a 'public disclosure' of the claims raised by" Plaintiffs in their FCA Amended Complaint. *Id.* at 330. Defendants assert that elements of Plaintiffs' FCA Amended Complaint were publicly disclosed prior to October 2000. In support of their argument, Defendants offer the following examples from the sources of which the court has taken judicial notice:

1. "It was not until '88–'89 when the ... military showed interest in the vaccine that changes had to be made ... so that larger quantities quicker [sic] could be made. This was just before the Gulf War," Burgoyne, who headed the production, testified in a March 3 Civil Service hearing.

 Burgoyne also testified that the changes—including the use of additional filters and a new type of container to grow the vaccine—improved the vaccine's safety by ensuring sterility. The changes also made it cheaper to produce.

 Some of the changes, Burgoyne said, may have been prompted by FDA concerns. "We needed to find a new method and continue producing it that way."

 ... The federal agency was concerned that there was no guarantee BioPort could make each batch of anthrax vaccine to the same standards.

 (A.J. Evenson, *Documents Hold Anthrax Secrets,* Lansing State Journal,

Aug. 25, 2000, at 1A, 7A, Br. Supp. Mot. Dismiss Amend. Compl. Ex. D.)

2. The anthrax vaccine "had been modified in some manner in order to strengthen its effect . . . the vaccine may not be the same one approved by the FDA."

(Zaid Testimony, Defs.' Mem. Supp. Mot. Dismiss Ex. 2.)

3. The GAO reported that a March 1992 Department of Defense ("DoD") inspection of the MDPH facility failed to find stability studies and FDA inspections of the manufacturing facility in 1997 and 1998 found "a number of deficiencies . . . that could compromise the safety and efficacy of any or all batches."

(Chan Testimony on Apr. 29, 1999, Defs.' Reply Br. Ex. A at 6–7; Chan Testimony on Oct. 12, 1999, Defs.' Reply Br. Ex. B at 8–9.)

4. The Lansing plant "has been cited repeatedly by the FDA for quality control deficiencies and 'numerous significant deviations from the Federal Food, Drug and Cosmetic Act, FDA's regulations and the standards in MBI's license.'"

(House Report, Defs.' Reply Br. Ex. C at 7.)

5. The House Report noted the relabeling of stockpiled vaccine "beyond the initial expiration date" had been retested by the DoD prior to July 1999. Some lots failed potency testing; others had "unresolved purity, potency, or sterility issues."

(*Id.* at 7, 12.)

6. The FDA had testified before the House Committee on Government Reform on several occasions in 1999 that it was aware of the potency, purity, and sterility issues. It had investigated and reviewed the historical manufacturing processes, and determined that the vaccine manufactured prior to 1999 was safe and effective.

(*Id.* at 61.)

7. The House Committee on Government Reform reported that their investigation revealed "[p]otency test failures during the DoD supplemental testing program [that] have raised questions regarding the validity of test procedures."

(*Id.* at 7.)

8. The House Committee on Government Reform reported that AVA had been originally approved for protection against cutaneous infection in an occupational setting, not for mass use by troops, causing DoD to acknowledge that "[t]he potency test required for the present vaccine has not been well correlated to efficacy in humans and it is doubtful that it can be."

(*Id.* at 42–44.)

The statements offered by Defendants were made in congressional testimony, congressional reports, and a large-circulation newspaper. Section 3730(e)(4)(A) states that statements made during congressional hearings, in congressional reports, and those in "news media" may constitute "public disclosure" for purposes of the FCA. 31 U.S.C. § 3730(e)(4)(A). Accordingly, the Court will proceed to the second element in the *Jones* test.

**B. *Whether the Public Disclosures were of the "Allegations or Transactions" that Form the Basis of Plaintiffs' FCA Amended Complaint***

The Court must next consider whether the public disclosures were of the allegations or transactions that form the basis of Plaintiffs' Amended Complaint. In *Jones*, the Sixth Circuit stated:

[I]f X + Y = Z, Z represents the *allegation* of fraud and X and Y represent its essential elements. In order to disclose the fraudulent *transaction* publicly, the combination of X and Y must be revealed, from which readers or listeners may infer Z, *i.e.*, the conclusion that fraud has been committed.

*[Q]ui tam* actions are barred only when enough information exists in the public domain to expose the fraudulent transaction (the combination of X and Y), or the allegation of fraud (Z).

*Jones*, 160 F.3d at 331 (emphasis in original) (quoting *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 654 (D.C.Cir.1994)). In *Jones*, the court was confronted with a situation in which only an allegation of fraud, but not the essential elements of the alleged fraud, was publicly disclosed by the would-be-relator appellant's pre-suit Whistleblower's Protection Act ("WPA") claim. The court stated that "although Appellant's WPA complaint may not have constituted an explicit, formal allegation of either fraud or the essential elements of fraud, it certainly presented enough facts to create an inference of wrongdoing on the part of Appellee." *Id.* at 332. The court thus found

"allegations or transactions" that formed the basis of the appellee's FCA claim. *Id.*

The instant case presents a much more straightforward "X + Y" public disclosure analysis, unlike the "Z" scenario in *Jones*. "Fraud consists of two elements—a misrepresented state of facts and a true state of facts—that constitute the X and the Y of the equation." *Id.* at 331. In *United States ex rel. Burns v. A.D. Roe Co.*, 186 F.3d 717 (6th Cir.1999), the court stated that the issue is whether the public disclosures "contained information as to both the actual [allegedly fraudulent] circumstances ... and the circumstances as they were being represented to the government ... and whether inferences of fraud reasonably could have been drawn from the" public disclosures. *Id.* at 724.

The Court finds that the above public disclosures meet the *Jones* test, because the public disclosures state that there are many potential deviations between the vaccine that was approved by the FDA and the vaccine that was actually being produced. For example, Zaid testified that the anthrax vaccine "had been modified in some manner in order to strengthen its effect ... the vaccine may not be the same one approved by the FDA." [1] (Zaid Testimony, Defs.' Mem.

1. Plaintiffs contend that Zaid's testimony did not specifically address the exact allegations that Plaintiffs raised in their Amended Complaint; thus, the Court should not rely on Zaid's statements. The Court disagrees. The "public disclosure" that is essential in this case, and which serves as the basis of Plaintiffs' Amended Complaint, is whether there was a disclosure that the vaccine being produced and sold to the Government was potentially different from that which was approved by the FDA. That is the essence of the fraud alleged by Plaintiffs, *i.e.*, MBPI and BioPort sold the Government a non-FDA-compliant vaccine while MBPI and BioPort told the Government that it was purchasing an FDA-compliant vaccine. The statements in the newspaper article, Zaid's testimony, and the

other noticed sources reveal the possibility of that alleged fraud.

Additionally, the Court has reviewed the Declaration of Mark S. Zaid that Plaintiffs submitted, (Zaid Decl., Pls.'/Relators' Supp. Mem. Law Regarding Public Disclosure Bar Arguments Ex. A), and finds that Zaid's testimony regarding his subjective awareness of the exact nature of the fraud alleged by Plaintiffs is irrelevant to this inquiry. What is important in this inquiry is the existence of statements that predate the filing of Plaintiffs' Amended Complaint and indicate that the vaccine being produced and sold to the Government differed from that which was approved by the FDA. The statements noticed by the Court objectively set forth such allegations.

Supp. Mot. Dismiss Ex. 2.) Zaid alleged "X" when he testified that the Government believed that the vaccine was being produced in accordance with FDA approval, and "Y" when he testified that the vaccine being produced may be different from that which the FDA approved. An inference of fraud can reasonably be drawn from Zaid's testimony, thus satisfying the *Jones* test. The same is true of the statements in the Lansing State Journal article. The article states that changes had been made to both the filters and the container in which the vaccine was produced, and that these changes may have "been prompted by FDA concerns."[2] (A.J. Evenson, *Documents Hold Anthrax Secrets*, Lansing State Journal, Aug. 25, 2000, at 1A, 7A, Br. Supp. Mot. Dismiss Amend. Compl. Ex. D.) One would reasonably conclude that the vaccine being produced and sold to the Government before or after the changes would have been different from that which was approved by the FDA. An inference of fraud can also reasonably be drawn from the House Report, which noted that the Lansing plant had been cited numerous times for deviating from FDA regulations and problems that arose during potency testing. (House Report, Defs.' Reply Br. Ex. C at 7, 12, 42–44, 61.) Accordingly, the Court will proceed to the third element in the *Jones* test.

## C. Whether Plaintiffs' FCA Amended Complaint Is "Based Upon" the Public Disclosures

The Court must next consider whether Plaintiffs' Amended Complaint is "based upon" the public disclosures. In *United States ex rel. McKenzie v. BellSouth Telecommunications, Inc.*, 123 F.3d 935, 939–41 (6th Cir.1997), the Sixth Circuit elucidated when a FCA suit is "based upon" a public disclosure. Relator McKenzie was a former employee of BellSouth's subsidiary, South Central Bell. *Id.* at 937. During her employment as a dispatcher for South Central Bell's maintenance technicians, McKenzie learned of South Central Bell's allegedly fraudulent billing practices involving federal customers. *Id.* When a telephone line was out of service for more than twenty-four hours, South Central Bell was obligated to refund the cost of that day's service to the deprived customer. *Id.* McKenzie's *qui tam* complaint alleged that South Central Bell falsified trouble reports to make it appear that a disabled line was repaired within twenty-four hours or that an exception to its refund rule applied. *Id.* BellSouth contended that McKenzie's allegations were "based upon" information publicly disclosed through two lawsuits filed against other companies owned by BellSouth that were nearly identical to some of McKenzie's claims. *Id.* at 939. McKenzie countered that while the two previously-filed suits were similar, her suit was not "based upon" public disclosures because it was not "derived from" the disclosures in those suits. *Id.* at 940. The issue of whether McKenzie's suit was jurisdictionally barred thus turned on the scope of the term "based upon" in § 3730(e)(4)(A). Since this issue was one of first impression in the Sixth Circuit, the *McKenzie* court turned to the Tenth Cir-

---

[2]. In their June 2, 2003, response to the Court's May 9, 2003, Memorandum Order taking judicial notice of the Lansing State Journal article, Plaintiffs contend that the statements made about the filter changes are incorrect, and thus unreliable as public disclosures. (Pls.' Second Supp. Mem. Law at 4.) While the author of the article may have incorrectly reported on the reason for the filter changes, such an inaccuracy does not preclude the article from serving as a public disclosure. One may still conclude that the vaccine being produced and sold to the Government was not the vaccine approved by the FDA; thus, the essential revelation of potential fraud remains, regardless of the accuracy of the article.

cuit's decision in *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568 (10th Cir. 1995), for guidance. *Id.*

In *Sandia*, Harold R. Fine ("Fine"), a former government auditor, filed a *qui tam* action under the FCA asserting that the Sandia National Laboratory, which was under the control of the Department of Energy ("DOE"), had misappropriated nuclear waste funds in violation of the Nuclear Waste Policy Act ("NWPA"). *Id.* at 569–70. Prior to the time Fine brought his FCA suit, and during which time Fine was employed by the DOE's Office of Inspector General, the United States General Accounting Office ("GAO") had issued a report that examined use of nuclear waste funds at three government laboratories, including Sandia National Laboratory. *Id.* at 569. Additionally, congressional hearings probed the laboratories' use of these funds and whether it violated the NWPA. *Id.* at 569–70. Thus, while the hearings did not specifically address whether the Sandia National Laboratory's practices violated the NWPA, the hearings "shed further light on the national laboratories' practice." *Id.* at 570. Fine contended that the basis of his FCA claim arose from his post-retirement investigation, as well as tips from an anonymous phone call. *Id.*

The issue before the *Sandia* court was whether the pre-suit report and hearing, both of which addressed the general type of fraud alleged by Fine but not the specific practice at Sandia National Laboratory, barred Fine's FCA suit as "based upon" public disclosure. Fine argued that neither the report nor the hearing specifically stated the allegations or transactions upon which he based his suit. *Id.* at 571. The Tenth Circuit construed the phrase "based upon" broadly, and stated that "[b]ecause these disclosures detailed the mechanics of the practice, revealed that at least two of Sandia's eight sister laboratories were engaged in it, and indicated the DOE's acqui-

escence, we conclude that they sufficiently alerted the Government to the likelihood that Sandia would also" misappropriate the nuclear waste funds. *Id.* The court stated that the disclosures *"set the government squarely on the trail of the alleged fraud* without Mr. Fine's assistance," *id.* (emphasis added), and "clearly put the government on notice;" thus, "it would be contrary to the purposes of the FCA to exercise jurisdiction over his claim." *Id.*

The *Sandia* court also stated that § 3730(e)(4)(A) does not require that the allegations disclosed have the same statutory basis as the allegations made in the FCA claim. *Id.* at 572. "[S]ection 3730(e)(4)(A) bars even those *qui tam* complaints which are based only *in part* upon public disclosures." *Id.* at 572 (emphasis in original) (citing *Precision Co. v. Koch Indus.*, 971 F.2d 548, 552 (10th Cir.1992)). The *Sandia* court thereby affirmed the district court's conclusion that the report and the hearing constituted "public disclosure" barring Fine's FCA claim. *Id.*

The Sixth Circuit "conclude[d] that the interpretation of 'based upon' endorsed by the Tenth Circuit is the most consistent with the FCA's purpose." *McKenzie*, 123 F.3d at 940.

> The jurisdictional requirements are designed to restrict the number of persons who can bring qui tam actions and thereby avoid parasitic suits. In construing "based upon" to mean "supported by" we *effectively preclude individuals who base any part of their allegations on publicly disclosed information from bringing a qui tam action.*

*Id.* (citing *Precision*, 971 F.2d at 552) (emphasis added).

 In the instant case, the numerous public disclosures of MBPI and BioPort's alleged problems with producing an FDA-compliant vaccine, while MBPI and Bio-

Port were selling their vaccine to the Government as FDA approved, put the Government "on the trail of the alleged fraud." It is irrelevant to this inquiry whether Plaintiffs' allegations and those gleaned from the public disclosures have the same statutory basis. Each of the statements noticed by the Court evinces that considerable questions were publicly raised regarding the quality of the vaccine and its compliance with FDA standards prior to October 10, 2000. The noticed statements also evince that changes were made to the manufacturing process, including changes in the filters and containers used to produce the vaccine, and that these changes where either made in reaction to or prompted by FDA concerns. Any one of these statements was sufficient to alert the Government to the possibility that the vaccine that it had been purchasing was not the FDA-approved vaccine that MBPI and BioPort claimed to be selling. Thus, under the Sixth Circuit's broad definition of "based upon" in *McKenzie,* this Court finds that the noticed statements clearly put the Government on notice. It would therefore be contrary to the purposes of the FCA to exercise jurisdiction over Plaintiffs' claim, unless Plaintiffs are found to be the original source of the information. Accordingly, the Court will proceed to the fourth element in the *Jones* test.

### D. Whether Plaintiffs were the Original Source

 Finally, the Court must consider whether Plaintiffs were the "original source" of the information from which they based their FCA Amended Complaint. In order to be an "original source," a relator must inform the Government of the alleged fraud before the information upon which the complaint is based has been publicly disclosed. *Jones,* 160 F.3d at 334.

Defendants assert that the above publicly disclosed information demonstrates that

Plaintiffs were not the original source of the allegations in their Amended Complaint. Additionally, Defendants argue that even if the Plaintiffs' Connecticut National Guard Report is deemed to have disclosed the alleged fraud to the Government, Plaintiffs' Report was itself based on publicly disclosed information. Defendants point to Plaintiffs' Testimony:

> *Spring and Summer 1998:* Research by officers began from Internet sites, and government documents. Officers remained skeptical of reports or stories that did not cite references. We obtained a copy of Senate Report 103–97 (Is Military Research Hazardous to Veterans' Health?; Lessons Spanning Half a Century). It was an official government document that said the vaccine should be considered investigational, and that the government could not rule out the vaccine as a causal factor in Gulf War Syndrome.
>
> . . . . .
>
> *Early October 1998:* ... Maj. Dingle and Capt. Rempfer were the two pilot participants in Tiger Team Alpha. Maj. Dingle performed the bulk of the research and worked very hard to ensure the information presented was factual. *Only material including government documents or established publications were used.*

(*Statements of Captain Thomas L. Rempfer, Connecticut National Guard, and Major Russell E. Dingle, Connecticut Air National Guard: Hearing Before the Subcomm. on Nat'l Sec., Veterans' Affairs, and Int'l Relations, House Comm. on Gov't Reform,* 106th Cong. (Mar. 24, 1999) (emphasis added).)

Defendants also cite Plaintiffs' Connecticut National Guard Report, which is attached to Plaintiffs' Amended Complaint:

> To conduct our work, we reviewed documents provided to us by FDA, DOD,

and the Michigan facility/BioPort Corporation pertaining to the anthrax vaccine. In addition, we reviewed published and unpublished scientific reports on anthrax vaccine and on the safety and efficacy of the vaccine. In addition, we interviewed officials of FDA, DOD, the Michigan facility/BioPort, and experts in anthrax vaccine in U.S. and the U.K.

(Pls.' Report, Am. Compl. Ex. A at 9.)

Plaintiffs contend that their Amended Complaint is based entirely on "personal knowledge of the facts and circumstances pertinent to this litigation outside their limited investigation for the National Guard unit." (Pls.' Resp. Mot. Dismiss at 6.) Plaintiffs insist that their investigation for the Connecticut National Guard and their subsequent report on their findings did not mention either the production changes or false claims submitted. While it may be true that Plaintiffs did not intentionally plagiarize the noticed sources in their Report, the Plaintiffs' lack of subjective awareness of the publicly disclosed statements has no bearing on whether Plaintiffs were the original source of the noticed statements. To find otherwise would constitute an endorsement of an "ostrich defense" to the original source requirement and open the floodgates to a sea of parasitic relators. Thus, the Court finds that Plaintiffs were not the original source of the publicly disclosed statements that pre-date the filing of Plaintiffs' suit.

Accordingly, Plaintiffs do not qualify as proper relators in this matter pursuant to 31 U.S.C. § 3730(e)(4). Therefore, the Court lacks jurisdiction and will dismiss Plaintiffs' suit with prejudice.

### Conclusion

For the foregoing reasons, Defendants' motion to dismiss will be granted. An Order consistent with this Opinion will be entered.