In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-2235 & 05-3202

UNITED STATES OF AMERICA, ex rel. DR. BRENT GEAR,

*Plaintiff-Appellant,*

*v.*

EMERGENCY MEDICAL ASSOCIATES OF ILLINOIS, INC.,
and ILLINOIS/INDIANA EM-1 MEDICAL SERVICES, S.C.,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 1046—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED DECEMBER 1, 2005—DECIDED FEBRUARY 1, 2006

Before FLAUM, *Chief Judge*, and BAUER and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* Brent Gear individually, and on behalf of the United States, filed this *qui tam* action under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.* He alleges that the defendants—Emergency Medical Associates of Illinois, Inc., and Illinois/Indiana EM-1 Medical Services, S.C.—fraudulently billed Medicare for services performed by residents in Midwestern University's residency program as if those services had been performed by attending physicians. The district court granted sum-

mary judgment to the defendants and Gear appeals. Our review is *de novo. Commercial Underwriters Ins. Co. v. Aires Envtl. Servs., Ltd.*, 259 F.3d 792 (7th Cir. 2001).

It's undisputed that both corporate defendants provide physicians to hospital emergency rooms. Gear is a graduate of Midwestern University's emergency medicine program and during the relevant time was fulfilling his residency requirements at three Chicago area hospitals: St. Bernard, Edgewater, and Grant.

Residents are medical school graduates who gain experience by working in hospitals. Residents' services are not reimbursable by Medicare; however, Medicare provides funds to hospitals to offset the costs of residency programs. 42 C.F.R. § 415.208(b)(1). On the other hand, the services of attending physicians, who are licensed doctors, are reimbursable by Medicare. Residents can obtain medical licenses and become senior residents. Senior residents are then properly allowed to moonlight as attending physicians. 42 C.F.R. § 415.208. When they act as attending physicians, their services are also reimbursed by Medicare.

That said, however, it is also true that senior residents cannot work as attending physicians during residency hours; in other words, they cannot be two things at once. The problem Gear highlights is that the two defendants double-billed Medicare for the work of residents in their capacity as attending physicians but performed during residency hours.

Gear filed this *qui tam* action claiming that these billing practices violated the FCA, which provides that "[a]ny person who . . . conspires to defraud the Government by getting a false or fraudulent claim allowed or paid . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains . . . ." 31 U.S.C. § 3729(a). Even though a *qui tam*

action is brought in the name of the government, 31 U.S.C. § 3730(b)(1), the government has a 60-day period in which to decide to participate—intervene—in the suit. 31 U.S.C. § 3730(b)(2). If it does intervene, government attorneys take control of the case; if not, the "relator," Gear in this case, may proceed on his own. 37 U.S.C. § 3730(c)(3). Regardless whether the government intervenes, the relator is eligible to receive a percentage of any recovery. If the government intervenes, that percentage is between 15 and 25 percent of the recovery, 37 U.S.C. § 3730(d)(1); if not, it is between 25 and 30 percent. 37 U.S.C. § 3730(d)(2). In this case, the government chose not to intervene.

There are bars to *qui tam* actions under the FCA. The relevant one here is the "public disclosure" bar, which provides, in part, that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a . . . Government [General] Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 37 U.S.C. § 3730(e)(4)(A). The bar is designed to deter parasitic *qui tam* actions. We have surmised that the word "jurisdiction" in the statute refers not to the power of the court, but to the right of a particular *qui tam* plaintiff to represent the government. *United States ex rel. Fallon v. Accudyne Corp.*, 97 F.3d 937, 941 (7th Cir. 1996):

> In context, the word appears to mean that once information becomes public, only the Attorney General and a relator who is an "original source" of the information may represent the United States. This does not curtail the categories of disputes that may be resolved (a real "jurisdictional" limit) but instead determines who may speak for the United States on a subject, and who if anyone gets a financial reward.

This statement is reinforced by *Hughes Aircraft Co. v. United States ex rel. Shumer*, 520 U.S. 939, 951 (1997), remarking that a similar provision in the 1982 version of the FCA (which was deleted by a 1986 Amendment) spoke "not just to the power of a particular court but to the substantive rights of the parties as well" even though the statute was phrased in jurisdictional terms.

To determine whether a relater has the right to bring a suit, we first look to two questions: Was the information on which his allegations are based "publicly disclosed" and, if so, is the suit based on the publicly disclosed information. If not, he avoids the public disclosure bar. However, even if his suit is based on public information, he can still proceed if he is an "original source" of the information. *United States and Mathews v. Bank of Farmington*, 166 F.3d 853, 859 (7th Cir. 1999).

The first issue, then, is whether the information on which the complaint is based was already publicly disclosed when Gear filed his complaint. *United States ex rel. Feingold v. Adminastar Fed., Inc.*, 324 F.3d 492 (7th Cir. 2003). Clearly, it was. Since the mid-1990s there have been public allegations that Medicare was being billed for services provided by residents as if attending physicians had actually performed the services. In 1998, the General Accounting Office issued a report to the chairman of the Subcommittee on Health, Committee on Ways and Means, of the House of Representatives. The report stated that in 1995 there was a settlement between the Department of Justice and the University of Pennsylvania under which the University agreed to pay $30 million to settle allegations of improper billing. Because of concern that such problems might be widespread, the Department of Health and Human Services-Office of Inspector General (OIG) instituted a nationwide initiative—known as Physicians at Teaching Hospitals (PATH) Audits—to investigate how the nation's 125 medical schools, including Midwestern Univer-

sity, billed Medicare for services provided by residents. The stated purpose of the PATH initiative was to determine whether hospitals and other entities were improperly billing Medicare for services provided by unsupervised residents. Teaching hospitals associated with the nation's 125 medical schools were informed that they were subject to an audit of the billings for resident services. Within a year, audits were underway or planned at 49 institutions. A few years later, five PATH audits had been resolved, resulting in three settlements totaling more than $37 million.

Medical news sources were taking notice, with some alarm. In 1997, the *American Medical News* reported that the PATH issue was gaining congressional interest. In 1998, *Physician's Weekly* reported that the "[t]eaching hospitals are still in the HHS inspector general's crosshairs." The *Journal of the American Heart Association* remarked about the concern the PATH audits were causing in teaching hospitals. Then in February 2000, the University of Chicago agreed to pay a $10.9 million settlement for improper billing for the work of unsupervised residents. This was at the same time that Gear, while a resident at Midwestern University, filed his complaint in this case. Fighting back from the audits, the American Association of Medical Colleges and the American Medical Association (AMA) filed a complaint in California seeking relief from what they saw as coercive conduct by the government.

Whether the information Gear provided in his complaint was in the public domain is not a close question. Public disclosure occurs when "critical elements exposing the transaction as fraudulent are placed in the public domain." *Feingold*, at 495. The fraud scheme Gear alleges was publicly disclosed.

Gear contends, however, that these public disclosures do not expose any transactions from which the government (or anyone else) could infer that the particular entities

he has named were fraudulently billing Medicare. We are unpersuaded by an argument that for there to be public disclosure, the specific defendants named in the lawsuit must have been identified in the public records. The disclosures at issue here were of industry-wide abuses and investigations. Defendants were implicated. Industry-wide public disclosures bar *qui tam* actions against any defendant who is directly identifiable from the public disclosures. *See United States v. Alcan Elec. and Eng'g, Inc.*, 197 F.3d 1014 (9th Cir. 1999); *United States ex rel. Findley v. FPC-Boron Employees' Club*, 105 F.3d 675 (D.C. Cir. 1997); *United States ex rel. Fine v. Sandia Corp.*, 70 F.3d 568 (10th Cir. 1995). We have said that "[w]here a public disclosure has occurred, [the government] is already in a position to vindicate society's interests, and a *qui tam* action would serve no purpose." *Feingold*, at 495.

We are also convinced that Gear's lawsuit is based on these disclosures. It is true that in response to the summary judgment motion Gear submitted his own affidavit saying that he based his complaint on "personal observations and experience." That statement, however, is insufficient to counter the weighty public record, which it is difficult to believe Gear did not notice, especially because he was an editor of the American College of Emergency Physicians' publication *24/7 News for Emergency Medicine Residents*. While Gear was an editor, that publication featured an article titled "PATH Investigations Result in First D.C. Settlement." The article described the PATH initiative and named five hospitals that settled PATH investigations. Gear's self-serving affidavit is insufficient to sustain a claim that his allegations are not based on public information. As we said in the *Feingold* case, "Because Feingold points to no evidence upon which this suit depends that is not publicly disclosed, we hold that Feingold has based this action on publicly disclosed documents . . . ." *Feingold*, at 497.

Nor can Gear be viewed as an "original source" as that term is used in the FCA. To qualify for that designation, Gear must not only have direct and independent knowledge of the information on which the suit is based, but he must have "voluntarily provided the information to the Government before filing [the] action . . . ." 31 U.S.C. § 3730(e)(4)(B). Gear admits he has never claimed to have spoken to the government about his claims prior to filing suit. For all these reasons, the district court correctly granted the defendants' motion for summary judgment.

Gear also contends that the district court abused its discretion in the award of $2,065.65 in costs to the defendants. Particularly he objects to the award of $200 for admission of defendants' counsel *pro hac vice* and to what he sees as excessive fees for copying documents. Looking particularly to the copying fees, we are somewhat in the dark as to why the amount is justified. At first, defendants requested $3,155.07 for internal copying fees. Upon Gear's objection, they withdrew their claim for $1,289.52 of that amount. They now contend that they charged 15 cents per page, and that information plus the documents filed and the number of copies required justifies the amount. Gear, however, points to information (which defendants do not contest) that in the building in which defendants' counsel's law firm is housed, a copy shop charges 6 to 7 cents per page. Gear multiples that amount by the number of copies calculated using the method defendants propose and arrives at a much lower cost—$676.20. Neither the district court decision nor the defendants' arguments in this court provide us with insight as to why the larger amount is justified. We therefore find an abuse of discretion and reduce the award of costs to $876.20 ($676.20 for copying and $200 for attorney admission).

Accordingly, the judgment for defendants is AFFIRMED, but the costs allowed in the district court are reduced

to $876.20. On this appeal, each side shall bear its own costs.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*